TIMOTHY S. SMITH,

               Plaintiff,

v.                                    Case No. 3:17-cv-1333-J-JRK

ROBERT WILKIE, Secretary,
Department of Veterans Affairs,

               Defendant.

_____

# O R D E R [1]

## I. Status

Plaintiff Timothy S. Smith initiated this action pro se on June 8, 2017, after the expiration of his appointment as a paid vocational rehabilitation and employment ("VR&E") intern for the Department of Veterans Affairs ("VA"). See Compl. (Doc. No. 1).[2] He later obtained counsel, see Notice of Appearance (Doc. No. 21), and filed the operative Amended Complaint (Doc. No. 29) on February 28, 2018 through counsel. The Amended Complaint, brought under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("the Act"), alleges discrimination under Sections 501 and 504 of the Act (counts I and IV, respectively); retaliation under Sections 501 and 504 of the Act (counts II and V, respectively); and interference, coercion, or intimidation under Sections 501 and 504 of

---

[1]     The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 36), filed April 12, 2018; Reference Order (Doc. No. 38), entered April 26, 2018.

[2]     The case was originally brought in the United States District Court for the District of Columbia. See Compl. That court transferred the case here on November 16, 2017, after finding venue appropriately lies in this Court. See Order (Doc. No. 19).

the Act (counts III and VI, respectively), which Plaintiff's counsel has clarified are akin to claims for hostile work environment, see Transcript of Oral Argument (Doc. No. 77; "Tr."), filed May 3, 2019, at 70.[3]

The case is now before the Court on Defendant's Motion and Memorandum for Summary Judgment (Doc. No. 56; "Motion"), filed September 18, 2018. Included with the Motion are a number of attached exhibits (Doc. Nos. 56-1 through 56-16), and separately-filed depositions, see Deposition of Timothy S. Smith (Doc. No. 54-1; "Smith Dep.") and attached exhibits (Doc. Nos. 54-2 through 54-16); Deposition of Tamira Bradshaw (Doc. No. 55-1; "Bradshaw Dep.") and attached exhibits (Doc. Nos. 55-2 through 55-5), all filed September 18, 2018. Plaintiff responded in opposition to the Motion on October 15, 2018. See Plaintiff's Response in Opposition to Motion for Summary Judgment (Doc. No. 62; "Response") and attached exhibits (Doc. Nos. 62-1 through 62-6). Then, with leave of Court, see Order (Doc. No. 69), Defendant replied and Plaintiff sur-replied. See Defendant's Reply Memorandum in Support of Summary Judgment (Doc. No. 70; "Reply"), filed March 6, 2019, and supporting Declaration of Bettie Bookhart (Doc. No. 73-1; "Bookhart Decl."), filed March 7, 2019[4]; Plaintiff's Sur-Reply in Opposition to Motion for Summary Judgment (Doc. No. 74; "Sur-Reply"), filed March 20, 2019. The Court held oral argument on the Motion on April 5, 2019. See Minute Entry (Doc. No. 76); Tr. Upon review of all relevant filings, and with the benefit of oral argument, the undersigned determines that the Motion is due to be granted.

---

[3]     Unless otherwise noted, all citations—including citations to page numbers of exhibits—follow the pagination assigned by the Court's electronic filing system (CM/ECF). In addition, the first time a document or exhibit is cited, the CM/ECF "document" number is provided; subsequent citations do not include this document number.

[4]     The Bookhart Decl. is attached to a Notice of Filing Declaration of Bettie Bookhart (Doc. No. 73), filed March 7, 2019.

## II.  Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Trask v. Sec'y, Dep't of Veterans Affairs</u>, 822 F.3d 1179, 1184, n.1 (11th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under the governing law."  <u>Furcron v. Mail Ctrs. Plus, LLC</u>, 843 F.3d 1295, 1303 (11th Cir. 2016) (quotations and citation omitted).  "A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u> (quotations and citation omitted).  In making this determination, the Court "view[s] all of the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  <u>Id.</u> at 1304 (quotations and citation omitted).  Unless otherwise noted, the following facts are undisputed.

## III. Facts

Plaintiff is a six-year Veteran of the United States Navy.  Affidavit of Timothy S. Smith (Doc. No. 62-2; "Smith Aff.") at 1.  Following his Navy service, Plaintiff was a paid VR&E counseling intern at the VA in Jacksonville, Florida from September 12, 2011 through November 23, 2013.[5]  Smith Dep. at 11-12, 49; <u>id.</u> Ex. 1 (Doc. No. 54-2) at 1; <u>id.</u> Ex. 12 at 1; Bradshaw Dep. at 22.  As part of the internship, Plaintiff completed in both 2011 and 2013 a training course entitled, "Prevention of Workplace Harassment/No FEAR," in which he was advised that if Equal Employment Opportunity ("EEO") counseling

---

[5]        Plaintiff began the internship in the "legacy" Student Temporary Employment Program (SCEP) and in about November 2012, it became the "Pathways" program.   Smith Dep. at 24-25, 48, Ex. 12 (Doc. No. 54-14).

or contact is desired, it must be requested within "45 days of an event or decision thought to be discriminatory." Bookhart Decl. at 1; see id. at Ex. 1 (Doc. No. 73-2) pp. 3, 17-18.

The internship hours were from 8:00 a.m. to 4:30 p.m. Monday through Friday. Smith Dep. at 25; Bradshaw Dep. at 23-24. As an intern, Plaintiff's duties "included "working directly with veterans, learning all the processes that [we]re involved with getting a veteran into [the vocational rehabilitation] program," as well as "assigning, completing [a] vocational exploration, [and] documenting all the interaction [he had] with the veteran[s]." Bradshaw Dep. at 27. Plaintiff also was responsible for "following up with th[e] veteran[s once they were in the program] to make sure they ha[d] everything that they need[ed] and . . . counseling them when they needed assistance for any areas that they were struggling in or things that they were doing well and then helping them move on directly into employment." Id. at 27-28.

During the time Plaintiff worked as a paid intern at the Jacksonville VA, he was the only intern. Smith Dep. at 49; Bradshaw Dep. at 9. A previous intern had been promoted to a vocational counselor and received an office with the promotion. Smith Dep. at 49. Plaintiff sat in a cubicle, just as the previous intern had done. Id.

One of the conditions of the internship was that Plaintiff be enrolled in a program to obtain a master's degree in vocational rehabilitation programing. Id. at Ex. 1; see id. at 12-13, 15 (Plaintiff testifying about pursuing a master's degree after discussions with his personal vocational rehabilitation counselor, Shannon Murphy); Bradshaw Dep. at 22. This is because a master's degree is required to be a vocational rehabilitation counselor. Bradshaw Dep. at 30. According to Plaintiff, he "was told that once [he] completed [his] Master's Degree and internship program, . . . [he] would be hired" as a vocational

rehabilitation counselor. Smith Aff. at 2. Official documents state that such employment, sometimes called a "conversion," is not guaranteed. See Smith Dep. at Ex. 1 p. 2 (Intern Agreement stating that "[b]efore the end of this [trial] period, the supervisor will appraise the Intern's performance" and "[b]ased on this appraisal and the supervisor's recommendation, the next higher management official will decide whether to retain or release the student").

Plaintiff enrolled as a full-time online evening student at Thomas University in August 2011 with an expected graduation date of July 2013. Smith Dep. at 13, 22-24, 58. He graduated as expected with a 4.0 grade point average. Id. at 22-24, 52, 56, Ex. 2B (Doc. No. 54-4) at 1. The master's degree coursework sometimes required Plaintiff to stay up late into the evening and early morning hours, and occasionally Plaintiff stayed up all night to meet certain school-related deadlines. Id. at 25-26. There were times that Plaintiff would receive a one- or two- day extension to turn in coursework. Id. at 27.

Another condition of the internship was that Plaintiff have a VA rated service-connected disability of at least thirty percent. Bradshaw Dep. at 14. When Plaintiff began his internship and continuing through today, he was categorized by the VA as eighty percent service-connected disabled. Smith Aff. at 1. The conditions from which Plaintiff suffers and their associated percentage ratings are: "sleep apnea associated with deviated nasal septum" (fifty percent from October 3, 2008); "muscle tension headaches associated with degenerative disc disease of the cervical spine" (ten percent from April 14, 2005 and thirty percent from January 30, 2008); "degenerative disc disease of the cervical spine" (ten percent from April 14, 2005); "status post bunionectomy, left foot" (ten percent from April 14, 2005); "bunionectomy right foot" (ten percent from April 14, 2005); "degenerative

disc disease of the lumbar spine" (ten percent from October 17, 2005); "hypertension" (noncompensable); and "deviated nasal septum" (noncompensable). Id. at 1-2; see Smith Dep. at 28, 42-46.[6]

As explained in more detail below, Plaintiff had some difficulties keeping up with his internship work. Plaintiff mainly attributes his difficulties during the internship to sleep apnea, low Vitamin D, a thyroid deficiency, and low testosterone, all of which can cause an individual to feel tired and have low energy. Smith Dep. at 28-30; see also id. at Ex. 3 (Doc. No. 54-5) p. 3. Plaintiff uses a sleep machine, commonly called a "CPAP," to help with the sleep apnea; he used one during the relevant time, but it did not always work well. Id. at 28-29. Plaintiff concedes, however, that at least some of the fatigue and tiredness he felt during the internship was the result of working full time and attending school full time. Id. at 59.

Limitations Plaintiff has from his other service-connected disabilities include unspecified issues walking, climbing, bending, stooping, crawling, or prolonged standing or walking. Id. at 42. According to Plaintiff, he can "[p]ossibly" walk two hours per day. Id. at 43.

Shannon Murphy, who had been Plaintiff's personal vocational rehabilitation counselor, served as his mentor during the internship. Id. at 48. Tamira Bradshaw was Plaintiff's supervisor. Id. at 51; Bradshaw Dep. at 8. According to Plaintiff, he had the same workload as full-time vocational counselors, even though he was told he would have

---

[6] Plaintiff also explained in answers to Defendant's interrogatories that he was diagnosed at an unspecified time with depression and anxiety and a psychiatric disorder related to his time in active duty service. See Smith Dep. Ex. 2B at 4. He indicated in the answers to interrogatories that these conditions and others were "exacerbated" because of the events that took place during his internship. Id. He does not rely on these particular conditions in arguing against summary judgment.

a lighter workload. Smith Dep. at 49-50, 75. Although he signed his own vocational reports, someone else had to review them because of his intern status. Id. at 50-51; Bradshaw Dep. at 30. Typically Ms. Murphy or Ms. Bradshaw would review them. Smith Dep. at 51. If they were out of the office, others would review the reports. Id. Some of the reports Plaintiff drafted required no changes after being reviewed, some of them required only one round of changes, and some required multiple rounds of changes. Id. at 52.

Plaintiff met with Ms. Bradshaw once or twice per week for training. Id. at 56. He could also meet with her if he had "any pressing things" and she was not busy. Id. Mainly, though, Plaintiff interacted with Ms. Murphy on case management issues. Id.

Plaintiff received a number of formal performance evaluations while he was an intern. Id. at 52-53; Declaration of Tamira Bradshaw (Doc. No. 56-1; "Bradshaw Decl.") at Ex. 1 (Doc. No. 56-2), Ex. 2 (Doc. No. 56-3), Ex. 10 (Doc. No. 56-11). In each, Plaintiff was marked "fully successful" or above. Smith Dep. at 52; Bradshaw Dep. at 31. Ms. Bradshaw testified that although there were problems with Plaintiff's performance, "[i]f [she] had marked him at anything less than fully successful, he would have been removed and would not have been able to finish his internship." Bradshaw Dep. at 47.

In Plaintiff's first evaluation, on November 29, 2011, Ms. Bradshaw noted that Plaintiff "was still learning the position" and was "considered fully successful." Bradshaw Decl. at 2, Ex. 1 p. 8; see Bradshaw Dep. at 40-41. In Plaintiff's first annual evaluation (but his second formal evaluation), on December 20, 2011, Ms. Bradshaw again rated Plaintiff "fully successful," noting that she was "mitigat[ing]" several performance standards

since Plaintiff had "only been in the job for 90 days."   Bradshaw Decl. at 2, Ex. 1 pp. 10-12; <u>see</u> Bradshaw Dep. at 43.

In Plaintiff's next formal evaluation, on April 25, 2012, Plaintiff was rated "fully successful."   Bradshaw Decl. at 2, Ex. 2 p. 7; <u>see</u> Bradshaw Dep. at 44.   Although Ms. Bradshaw declares that "[a]t that time, [she] also advised him of the problems with and in his reports," Bradshaw Decl. at 2; the formal evaluation does not reflect any specific problems with reports, <u>see</u> <u>id.</u> at Ex. 2.

On September 21, 2012, Ms. Bradshaw sent Plaintiff an email advising him that his "CER files" were not properly maintained, providing him with a diagram showing the proper order for the files, and asking him to "do a better job of keeping [the files] neat and orderly" because the files were permanent records of Veterans.   Bradshaw Decl. at 2, Ex. 3 (Doc. No. 56-4) p. 2.[7]

Ms. Murphy completed a "Practicum Evaluation" on October 10, 2012 for Thomas University in connection with Plaintiff's master's program.   Smith Dep. at 53-54, Ex. 4 (Doc. No. 54-6) pp. 1-3 (some capitalization omitted).   In that evaluation, Ms. Murphy marked Plaintiff "Average, acceptable level of performance" or "Below average performance, some aspects acceptable" in a number of areas, noting he struggled with "time management, writing effectively and correcting mistakes."   <u>Id.</u> at Ex. 4 pp. 1-3.[8] Ms. Murphy also noted Plaintiff was "often overwhelmed by the many facets of the job." <u>Id.</u> at Ex. 4 p. 3.

---

[7]     The Bradshaw Decl. reflects a date of September 12, 2012 for this email, but that date appears to be a typographical error because the email itself is dated September 21, 2012.

[8]     Plaintiff was not made aware of this or other later-dated practicum evaluations submitted to Thomas University until discovery in this case.  Smith Dep. at 53-54.  But, he does not raise any authenticity issues regarding them.

Plaintiff and Ms. Bradshaw met on October 12, 2012 to discuss "two issues of concern" Ms. Bradshaw had about Plaintiff's internship performance.  Id. at Ex. 6 (Doc. No. 54-8) (memorandum dated October 19, 2012 recapping the matters that were discussed during the October 12, 2012 meeting); see id. at Ex. 8 (Doc. No. 54-10) (Ms. Bradshaw's October 12, 2012 note memorializing the meeting); id. at 68-69; Bradshaw Decl. at 2-3.  Ms. Bradshaw followed up the discussion with the October 19, 2012 written memorandum to Plaintiff containing the subject line, "Verbal Counseling."  Smith Dep. at Ex. 6; Bradshaw Decl. at 3.  The memorandum summarizes the two issues that were discussed:

1. We discussed the Veteran who came into the office saying that you would hire him for your real estate company if he got trained in that field.  We discussed the ethical issues surrounding this and that you should not have any cross over from your real estate business into this office or it's [sic] Veterans.  You did explain that you had given this information to the Veteran prior to becoming employed here and that you have since spoken to the Veteran to inform him that you would not be able to employ him in real estate due to your current employment situation.

2. We also discussed the chain of command and that when your mentor or supervisor informs you of something that needs to be done you are to do that.  Shannon Murphy had explained to you how to handle a case for a Veteran in which you had made an entitlement decision and cleared the pending issue even though the Veteran left the office. However, you contacted Ed Laroche in the RO to have him change the cleared issue into a disallowance, which was not correct for this case.  You did explain that you thought you could fix the situation, however the fix was not correct.  We discussed that it is extremely important that you follow the chain of command and what you are told to do by a supervisor or mentor. If you have questions you can always bring that to me but you should not circumvent the system.

Smith Dep. at Ex. 6[9]; see id. at 68-70.  Plaintiff signed the memorandum on October 19, 2012 to indicate he received a copy of it.  Id.

---

[9]    The memorandum is duplicated as Exhibit 6 to the Bradshaw Decl.

In Ms. Bradshaw's note memorializing the October 12, 2012 meeting (that does not appear to have been provided to Plaintiff at the time), Ms. Bradshaw wrote that she "reminded [Plaintiff] that the conversion of this position is not guaranteed and that his internship was his chance to impress us." Id. at Ex. 8.[10] She stated, "at this point things were not looking good" for converting Plaintiff to a permanent position. Id. She "reviewed with him other positions that he could do with his degree." Id. She also discussed with Plaintiff that she "would become [his] mentor as it did not seem to be working with his current mentor." Id.

According to Ms. Bradshaw, prior to October 12, 2012, Plaintiff "had not come to [her] to discuss any medical issues he had that were interfering with his job performance." Bradshaw Decl. at 2. Plaintiff testified generally that he requested accommodations from Ms. Bradshaw. Smith Dep. at 55. According to Plaintiff, he asked for his own office to be free from distractions. Id. In response, Ms. Bradshaw told him, "you're an intern." Id. Plaintiff testified that in October 2012, he was having difficulty keeping up with reports due to exhaustion. Id. at 61. Plaintiff stated he asked for unspecified "things," but Ms. Bradshaw "just was no help" and "never once asked [him] what accommodations [he] needed" despite knowing he had to have at least a 30-percent disability rating. Id.

On October 16, 2012, Plaintiff and Ms. Bradshaw met again. Id. at 70-71, 76, Ex. 8; Bradshaw Decl. at 3. According to Plaintiff's deposition testimony, he generally "told [Ms. Bradshaw] about the medical issues [he] was going through and all she did was keep pushing [him] to get the reports in, which wasn't going to help [him] get there." Smith Dep.

---

[10] This note memorializing the October 12, 2012 meeting is duplicated as Exhibit 4 to the Bradshaw Decl.

at 76; see also id. at Ex. 3 p. 3 (Plaintiff testifying during his EEO proceedings that "[i]n the beginning [management] didn't know everything about [his disability], but as I was having some struggles at work, they did, I informed them what was going on in October of—October of 2012, I let them know what was going—oh, I let Tami [Bradshaw] know"). Ms. Bradshaw testified during her deposition that during the October 16, 2012 meeting, she was told generally about a disability, but she testified she did not know the nature of his disability: "I would have asked him not to give any specifics on his disabilities, either service-connected or non-service connected. As I mentioned before, it would be[] inappropriate for me to have that discussion with him." Bradshaw Dep. at 62; see id. at 75; id. at 65 (Ms. Bradshaw confirming she knew Plaintiff was having difficulty due to his disability); id. Ex. D (Doc. No. 55-5) at 3 (Ms. Bradshaw testifying during the EEO process that "he said he was having difficulty due to his disabilities").

According to Ms. Bradshaw, at the time of the October 16, 2012 meeting and the whole time Plaintiff was an intern, if someone made a request for an accommodation, it would have been reviewed by Human Resources ("HR").[11] Bradshaw Dep. at 57-58. Only if it were "outside the normal realm of accommodations" would HR contact her about it. Id. at 57.

Plaintiff testified that during the October 16, 2012 meeting, he asked Ms. Bradshaw for a modified work schedule. Smith Dep. at 70-71. He proposed coming in a couple of hours late when he was tired and making up the time either at the end of the workday or on a Saturday. Id. at 72. Plaintiff testified he was told "absolutely not" because he was "an intern." Id. at 63; see id. at 78. Plaintiff was allowed to "flex 15 minutes" of his time

---

[11]       The accommodation review process has since changed. See Bradshaw Dep. at 58.

each day but everyone received that privilege.   Id. at 72.[12]   Plaintiff declares that as

soon as he made Ms. Bradshaw "aware of [his unspecified] disabilities, she began to

retaliate against [him], by barely talking to [him], becoming increasingly belittling and

hostile, and suddenly threatening [his] termination."   Smith Aff. at 3.

Ms. Bradshaw's declaration and her notes from the October 16, 2012 meeting

reflect that during that meeting, she reiterated to Plaintiff that "he needed to get caught up

on his work, that he needed to make sure he turned his reports in on time, and that he

needed to [go] to [her] with any questions."   Bradshaw Decl. at 3; see Smith Dep. at Ex.

8[13] (notes from meeting).   According to Ms. Bradshaw, Plaintiff "then indicated that he

was having a lot of medical issues that made it difficult for him to concentrate," so she "told

him [she] would send him a link to the [HR] office so he could make a request for a

reasonable accommodation to HR because HR processed such requests."   Bradshaw

Decl. at 3; see Smith Dep. at Ex. 8; id. at 77.

Ms. Bradshaw emailed Plaintiff the next day, October 17, 2012, regarding

accommodations.   Bradshaw Decl. at 3; Smith Dep. at Ex. 5 (Doc. No. 54-7) p. 3 (email).[14]

Ms. Bradshaw stated the following: "As we discussed yesterday that [sic] you have some

medical issues that are interfering with your ability to perform your job I sent you the HR

---

[12]       In answering Defendant's interrogatories, Plaintiff stated that he contacted Ms. Bradshaw "in September 2012, . . .told her of [his] disabilities that were affecting [his] work and the medications that [he] was prescribed by the VA."   Smith Dep. Ex. 2B at 5.   According to Plaintiff, he "asked for reasonable accommodations orally for a modified work schedule but was denied."   Id.   Given his later testimony that he told Ms. Bradshaw about his medical issues and requested an accommodation during the October 16, 2012 meeting, it appears Plaintiff was mistaken about the September date in the interrogatories.   And, the Court notes that Plaintiff does not rely upon this interrogatory response at all in arguing against summary judgment so the Court need not consider it.   See Fed. R. Civ. P. 56(c)(3) (noting that "[t]he court need not consider only the cited materials, but it may consider other materials in the record").

[13]       The notes from this date are duplicated as Exhibit 4 to the Bradshaw Decl.

[14]       This email is duplicated as Exhibit 5 to the Bradshaw Decl.

link on SharePoint to request a reasonable accommodation. I recommend that you follow the procedure to make this request." Smith Dep. at Ex. 5 p. 3; see id. at 63. Ms. Bradshaw copied Tamanique Clark, an HR Specialist, "to help facilitate [Plaintiff's] contact with HR." Id. at Ex. 5 p. 3.

According to Plaintiff, this email was only intended to address his headaches, not other issues he asked Ms. Bradshaw about. Id. at 62, 64. Plaintiff testified he never requested of HR that he receive a modified work schedule because Ms. Bradshaw had already told him he "would not have [his] schedule modified." Id. at 64, 65; see id. at 78. Instead, in response to Ms. Clark writing Plaintiff inquiring whether he needed "an accommodation," Plaintiff wrote to Ms. Clark on October 17, 2012 that his "eyes [were] really bothering [him]" and requested anti-glare screens for his two computer monitors. Id. at Ex. 5 p. 2; see id. at 66-67. Plaintiff also inquired whether there were any programs he could download to make computer fonts larger. Id. at Ex. 5 p. 2.

Plaintiff received a second annual evaluation (his fourth formal evaluation) on November 6, 2012 in which he was again rated "fully successful." Bradshaw Decl. at 2, Ex. 2 p. 12. Ms. Bradshaw declares that at this time, she "again explained to [Plaintiff] the problems and issues that [she] continued to see with and in his reports," id. at 2, but the evaluation does not reflect that, id. at Ex. 2 p. 12.

On December 11, 2012, Ms. Bradshaw completed another "Practicum Evaluation" for Thomas University. Smith Dep. at Ex. 4 pp. 4-6 (some capitalization omitted). In each area, Plaintiff was marked "Average, acceptable level of performance" or "Below average performance, some aspects acceptable." Id. In the comments section, Ms. Bradshaw wrote that Plaintiff's "writing ability and attention to detail are still less than ideal."

Id. at Ex. 4 p. 6. Although Plaintiff interacted well with fellow employees, he "ha[d] difficulty with the multiple number of tasks that are required of this job," his documentation "typically ha[d] to be returned for missing information, misspellings, and other issues that appear to hinge on an attention to detail," and he did "not readily display a natural counseling demeanor when dealing with clients." Id.

Ms. Bradshaw emailed Plaintiff on December 18, 2012, observing he had not been attending the "designated [biweekly] staffing times . . . in a long time," making sure he did not have any questions, and stating that she would continue to hold open the biweekly staffing times for Plaintiff "to come in with questions." Bradshaw Decl. at Ex. 7 (Doc. No. 56-8), p. 2; see id. at 4.

Ms. Clark from HR responded to Plaintiff's accommodation request email on December 31, 2012, apologizing for the delay and stating that she would need medical documentation or for Plaintiff's physician to complete a form prior to approving the anti-glare screens. Smith Dep. at Ex. 5 p. 2. As to the request about the font size, she indicated that the screen could be modified through settings on Plaintiff's computer, and she provided him with a phone number to obtain assistance with that. Id. Plaintiff returned the required documentation from his doctor on January 30, 2013. Id. at Ex. 5 p. 1. The record does not contain this documentation; just an email from Plaintiff to Ms. Clark stating that it was being provided. Id.

In the meantime, Plaintiff made a request in writing, via email, to modify his work schedule. Id. at Ex. 7 (Doc. No. 54-9)[15]; see id. at 73. Specifically, in response to an email from Ms. Bradshaw following up with Plaintiff about a January 9, 2013 meeting

_____

[15] This email is duplicated as Exhibit 9 to the Bradshaw Decl.

between the two because Plaintiff was behind on his "write ups," he wrote Ms. Bradshaw on January 10, 2013 and asked if it was "possible for [him] to come in on Saturday to focus on the 1902b's." Id. at Ex. 7. (Evidently, 1902b's are the same thing as "write ups" and "reports.") Ms. Bradshaw responded the same day: "Unfortunately, I can't authorize you to be here on Saturday as an intern. Credit time can only be authorized for those with a standard case load." Id.; see id. at 74. Ms. Bradshaw continued, "You are welcome to flex your schedule to come in 15 minutes early each morning to give you some quiet time to work on reports. Which means you could then leave at 4:15 at the end of the day if you got here at 7:45." Id. at Ex. 7; see id. at 75. Plaintiff did not follow up with HR regarding this request to come in on Saturday. Id. at 75.

Plaintiff testified there were unspecified "other times" he asked Ms. Bradshaw to come in on a Saturday to get caught up, but Ms. Bradshaw continued to deny his request. Id. at 74. Plaintiff never received any modifications in his schedule. Id. at 61. According to Ms. Bradshaw, "It would be rare for an intern to work on a Saturday unless the intern had work to complete that qualified for overtime and overtime had been budgeted." Bradshaw Decl. at 5.

Ms. Bradshaw's written narrative from the January 9, 2013 meeting, confirmed by her declaration, states that during the meeting, Plaintiff advised her he was "about 10 reports behind" and she in turn "let him know that it was very disturbing that he was over 3 months behind." Id. at Ex. 8 p. 2; see id. at 4. Her notes reflect that Plaintiff advised her "he was fatigued and he has been working with doctors to try to get that figured out." Id. at Ex. 8 p. 2. Plaintiff also stated that "he tries to work on the writeups in the morning when he is fresh but he has been working late for school and is very fatigued." Id. Ms.

Bradshaw's notes document that she had "previously [given Plaintiff] the contact information for HR for accommodation." Id.

On March 7, 2013, Ms. Clark emailed Plaintiff, admitting she "forgot about [Plaintiff]," apologizing, and indicating that she ordered the screens. Smith Dep. at Ex. 5 p. 1. Plaintiff received the anti-glare screens on March 15, 2013. Id.; see id. at 61. He wrote Ms. Bradshaw that day thanking her for facilitating the request. Id. at Ex. 5 p. 1.

In April 2013, Ms. Bradshaw met with Plaintiff to complete his mid-year evaluation. Id. at 80-81, Ex. 10; Bradshaw Decl. at 5, Ex. 10; Bradshaw Dep. at 46-47. She advised Plaintiff that although she would rate him "fully successful" on his evaluation, she would not be converting Plaintiff from an intern to a VA counselor. Smith Dep. at 80-81, Ex. 10 (Doc. No. 54-12) (Ms. Bradshaw's meeting notes).[16] Ms. Bradshaw's notes from the meeting, confirmed by her declaration, reflect that the decision had been made not to convert him because "he has not been able to get to the level that we would expect for a converted counselor." Id. at Ex. 10; Bradshaw Decl. at 5. Her notes further reflect:

> I let him know that we wanted to make sure that he graduated and that when he completes his internship hours on May 3, 2013 that we would not be converting him and that would be his last day. I let him know that we wanted to give him at least 2 weeks' notice so that he could plan and that I know he has some leave remaining that he could take.

> He said that he thought he was getting better because he had caught up on his reports. I explained that the reports are not at the level we would expect at this point in his internship as I am still correcting them. I informed him that if he still desired to work in Vocational Rehabilitation that he might do better at the State with a smaller case load but that this was not a good fit for him. He said if the VA was not going to support him then he did not know that anyone else would. He said that he has put all his effort in getting his retirement set up for this job. He said that he has been pushing his doctors to get him new medicine so he that he could concentrate better. He asked

---

[16] The notes from this date are duplicated as Exhibit 11 to the Bradshaw Decl.

what he could do to get better and I let him know that the time for that has passed.

He stated that he needed to take the rest of the day to think about what he needed to do. I let him know that was fine, to put in the leave and I would approve it.

Smith Dep. at Ex. 10.

After the April 2013 mid-year evaluation, Plaintiff wrote a letter to Ms. Bradshaw dated April 24, 2013 in which he asked her to reconsider her decision not to convert him to a VE counselor. Id. at 81-82, Ex. 9 (Doc. No. 54-11). The letter states:

Tami,

I have taken this week to reflect on what has happened. I would like to start by asking you to reconsider your position on me becoming a permanent employee. I have looked at every evaluation and all have been Fully Successful or better. I have worked full time, maintained a 4.0 average to date in a full time Masters program and dealt with service related disabilities. I feel I am a huge benefit to these Veteran's [sic] and to your program. No one understands the long journey to rehabilitation better than I do. I have lived it.

Tami, I am teachable. In many cases I have exceeded the average in rehabs. I have over 80 cases as an intern and have stayed on top of all of them. I am a self-starter. I work whether you are there or not.

I admit I am better with the Veteran's [sic] than I am at writing reports, but all of my reports are caught up. If something is not right, I will do exactly what you ask. I desire to learn and do a good job. I have gone the extra mile to be a team player and not buck the system. I am sorry for the time it has taken you to overlook all of my reports.

Tami, I apologize if I have offended you in any way or have not performed to the standard you think I should have in report writing, during an internship. I am asking that you take another look at my overall performance. I feel confident that if I can maintain a 4.0 in a Masters program that is mostly paper writing, I can get report writing improved.

I would hate to see the time that you and others have invested in me go to waste and I would hate to see the time and money (not to mention the loss of my eye-sight) that has been spent on this Masters program in rehabilitation program be for naught. Please give consideration to my request.

Thank you in advance for every opportunity.

Respectfully,

Timothy S. Smith.

Id. at Ex. 9.

Ms. Bradshaw "construed the letter as a request for more time to be evaluated for [a] conversion to a VR&E counselor."  Bradshaw Decl. at 6.  Upon receiving it, she "consulted with her supervisor . . . and HR officials."  Id.  Because Plaintiff was not scheduled to complete his coursework until July 2013, "the decision was made to give him more time to be evaluated for conversion to a permanent position as a VR&E counselor." Id. at 6, Ex. 11; see Smith Dep. at 82.[17]

One day after Plaintiff sent the letter, on April 25, 2013, Ms. Murphy emailed Ms. Bradshaw stating Plaintiff had come to her seeking help with a 1902b and that based upon their interaction, Ms. Murphy felt Plaintiff was "unable to grasp the basic eligibility requirements and understand the importance of the 1902b and its many components." Smith Dep. at Ex. 11 (Doc. No. 54-13) p. 5. Plaintiff testified he did not recall making the request for help set forth in the email.  Id. at 91.

The next day, April 26, 2013, Ms. Bradshaw completed an Internship Evaluation for Thomas University.  Id. at Ex. 4 pp. 7-9.  In the various performance areas, she marked

_____

[17]    Relying on the wording of his ultimate termination letter, Plaintiff disputes that he was actually given more time to be evaluated.  See Response at 12 (citing id. at Ex. D).  According to Plaintiff, all along he had until November 23, 2013 to complete the internship.  See id.  But, Plaintiff's initial appointment letter specifically states that the appointment was "not to exceed 7/30/13," Smith Dep. at Ex. 1 p.1, so his internship was indeed extended for longer than the initial appointment letter contemplated. Based upon the ultimate termination letter, it appears that November 23, 2013 is the latest date that Plaintiff's internship could have extended (and ultimately was extended) because it fell 120 days after Plaintiff's graduation date (in July 2013).  See Smith Dep. at Ex. 12 (citation omitted).

18

Plaintiff "Average, acceptable level of performance" or "Below average performance, some aspects acceptable." Id. In the comments section, Ms. Murphy wrote that Plaintiff "continue[d] to strive to learn the position of a Vocational Rehabilitation Counselor with the VA" but that "[u]nfortunately his writing ability and attention to detail are still not up to par with other interns at this stage of the internship." Id.

During the additional time that Plaintiff was being evaluated for a possible conversion, Plaintiff did not receive any accommodations. Id. at 82-83. Plaintiff testified that he still "struggl[ed] with the same things [he] had been struggling [with] all along." Id. at 82. Plaintiff's master's program ended in July, but he was permitted to continue the internship until November. Id. at 83. Plaintiff testified that although he was no longer staying up late during that time period to do homework, he had additional stress because he knew that Ms. Bradshaw was trying to terminate him. Id. at 83-84.

Sometime in about May 2013, Ms. Murphy became the office supervisor, but Ms. Bradshaw wrote Plaintiff an email on May 28, 2013, stating that Ms. Bradshaw would remain Plaintiff's internship supervisor "since [he was] so close to being done" with the internship. Id. at Ex. 11 p. 3; see id. at 88-89 (Plaintiff testifying generally that this email chain is between him and Ms. Bradshaw). Ms. Bradshaw also noted in the email that Plaintiff had not submitted any "write ups from last week" and that Plaintiff had not resubmitted one of the write ups she had previously returned to him. Id. at Ex. 11 p. 3; see id. at 88-89.

Plaintiff responded on May 28, 2013, indicating that he would "be focusing on 1902b's this week." Id. at Ex. 11 p. 3. Ms. Bradshaw replied the same day, stating she "appreciate[d] the update" but reminding him that his "performance standards" required

that "determinations and counseling actions should be documented the same day they occur." Id. (internal quotation omitted); see id. at 89. Ms. Bradshaw also reminded Plaintiff that according to the performance standards, if circumstances interfered with a same-day completion, "documentation will be completed within 5 business days of the determination or counseling action." Id. (internal quotation omitted); see id. at 89. According to Plaintiff during his deposition, other counselors told him, "nobody is ever caught up." Id. at 89. Plaintiff stated that he was not able to meet the five-day requirement without accommodations. Id. at 90.

Ms. Murphy authored a summary on June 15, 2013, that Ms. Bradshaw reviewed, documenting issues that a Veteran had raised about Plaintiff's interaction with him. Bradshaw Decl. at 6, Ex. 12.

On July 1, 2013, Ms. Bradshaw completed a Final Evaluation for Plaintiff's internship program through Thomas University. Smith Dep. at Ex. 4. pp. 10-12. In the various performance areas, she marked Plaintiff "Average, acceptable level of performance" or "Below average performance, some aspects acceptable." Id. In the comments section, she wrote that Plaintiff "still struggle[ed] with the documentation of the position"; Plaintiff did "not appear to use his time well and [did] not tolerate stress"; Plaintiff's "attention to detail on the job [was] lacking and [did] not appear to have approved to reach the standard of other interns from the past." Id. at Ex. 4 p. 12.

Plaintiff testified that although he was not supposed to end the internship until November 23 or 24, 2013, Ms. Bradshaw called him on November 19th and told him he needed to "clear out [his] desk, and get out." Id. at 85; see id. at 91-93. Plaintiff ended up in Ms. Bradshaw's office, and she provided him with a letter containing the subject line,

"Expiration of Appointment." Id. at 92, Ex. 12. The letter indicates that Plaintiff's appointment "expires on Saturday, November 23, 2013," but that Plaintiff's "last day of duty will be today, Tuesday, November 19, 2013." Id. at Ex. 12. The letter is signed by Kerrie Witty, the Director of the Veterans Benefits Administration for the region. Id. There is a handwritten note on the letter stating that Plaintiff was given a copy of it but refused to sign it. Id.

According to Ms. Bradshaw, although "she did not provide a recommendation in favor of extending an offer of conversion," she does not recall discussing the matter with Ms. Witty. Bradshaw Decl. at 6. Nor does Ms. Witty recall having any conversation with Ms. Bradshaw regarding the matter. Declaration of Kerrie Witty (Doc. No. 56-14; "Witty Decl.") at 2.[18] Ms. Witty made the ultimate decision not to extend an offer of conversion to the position of VR&E counselor. Id. at 2. She did so after having discussions with Ms. Bradshaw's supervisor, Maria Rodriguez, and officials in HR, as well as reviewing performance evaluations and noting "the absence of a favorable recommendation for conversion from [Plaintiff's] supervisor," Ms. Bradshaw. Id. According to Ms. Witty, she "did not know of any specific disability [Plaintiff] may have had nor did [she] know whether he had a history of engaging in EEO protected activity." Id. at 3. "Hence," declares Ms. Witty, she "did not discriminate nor retaliate against [Plaintiff] in allowing his appointment to expire [or] in declining to extend an offer of non-competitive conversion to a VR&E counselor." Id.

On November 25, 2013, Plaintiff filed a "Complaint of Employment Discrimination" with the EEO ("EEO Complaint"). Smith Dep. at Ex. 13 (Doc. No. 54-15) (some

---

[18]     The Witty Declaration is duplicated as Exhibit F to the Response.

capitalization omitted); <u>see id.</u> at 95.  According to the EEO Complaint, Plaintiff alleged "wrongful termination, discrimination against service connected disabilities." <u>Id.</u> at Ex. 13 (capitalization omitted); <u>see id.</u> at 96.

During the EEO process, Plaintiff completed an affidavit on April 29, 2014 in which he detailed the basis of his EEO Complaint. <u>Id.</u> at Ex. 14 (Doc. No. 54-16).  As part of that affidavit, Plaintiff "disput[ed] the fact that [Ms. Bradshaw in an affidavit] failed to tell [the EEO officer] that [he] specifically asked [Ms. Bradshaw] for a modified work schedule due to fatigue and other service connected disabilities," and he explained that Ms. Bradshaw began to retaliate against him in response, "suddenly threatening [his] termination." <u>Id.</u>  According to Plaintiff, Ms. Bradshaw "never wrote [him] up concerning his performance nor did she ever offer neither assistance nor training regarding reports." <u>Id.</u>

After Plaintiff was terminated, he sought employment as a vocational rehabilitation counselor outside of the VA. <u>Id.</u> at 34.  He applied at various federal agencies but did not obtain employment. <u>Id.</u> at 34-35. Plaintiff testified that when he was "going through the process when [he] was let go," he was taking a "mood medicine" at night to help him sleep. <u>Id.</u> at 6.

During Plaintiff's August 21, 2018 deposition, he testified that his service-related disabilities are currently under control. <u>Id.</u> at 32.  With his current CPAP machine, Plaintiff typically gets six to eight hours of sleep per night, but some days he still feels fatigued when he wakes up. <u>Id.</u> at 38.  He works for a brokerage firm from home, where he can set his own hours and work when he wants, typically about one hour per day. <u>Id.</u> at 32-33, 38.  He testified that he is unable to work a typical job because of fatigue,

tiredness, headaches, and an inability to concentrate.  Id. at 33.  According to Plaintiff, the maximum amount of time he is currently able to work is about one hour.  Id. at 34, 42.  But, Plaintiff testified that with proper accommodations, he could work a full eight-hour day if he "had to."  Id. at 39-40, 41.  Plaintiff indicated that the needed accommodations would be a quiet office, flexibility in his schedule, or working from home.  Id. at 41.

## IV.  Discussion[19]

### A.  Whether Claims Are Time Barred

The Regulations addressing the Act require that "persons who believe they have been discriminated against on the basis of . . . disability . . . consult a Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). An individual "must initiate contact with a Counselor within 45 days of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  Id. § 1614.105(a)(1).  But, this time period must be extended "when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission."  Id. § 1614.105(a)(2).

---

[19] Defendant represents that "[t]he Eleventh Circuit has not addressed whether a federal employee can assert a claim under [Section] 504 of the Act," the section applicable to entities that receive federal funding.  Motion at 1 n.1.  Defendant does not otherwise address the issue or argue whether Plaintiff should be permitted to bring claims under both Sections 501 and 504.  For purposes of this Order, it is unnecessary to decide.

"Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies." Shiver v. Chertoff, 549 F.3d 1342, 1344 (11th Cir. 2008) (citation omitted). "[T]he 45—day time limit is not jurisdictional; rather, it functions like a statute of limitations, and, 'like a statute of limitations, it is subject to waiver, estoppel, and equitable tolling.'" Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1243 (11th Cir. 2012) (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) (internal alterations omitted)). "[T]he purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer." Brown v. Snow, 440 F.3d 1259, 1263 (11th Cir. 2006) (quotation and citation omitted).

Defendant argues that "[a]ll of Plaintiff's discrete claims of discrimination and/or retaliation occurring more than 45-days before he initiated the EEO process . . . would be time-barred." Motion at 8. According to Defendant, this would encompass "any denial of a request for accommodation or decision made before October 11, 2013." Id. Plaintiff responds that he "was not notified of the time limits and was not otherwise aware of them," so the time limit should be extended. Response at 7. In support of that assertion, Plaintiff cites his deposition (the Smith Dep.) at page 96, lines 5-8, and his affidavit (the Smith Aff.) See Response at 7; Sur-Reply at 1-2. In his deposition, however, Plaintiff merely testified in response to a question about the basis of his EEO Complaint that "there was a whole plethora of things to learn about the process of going through this. I didn't have everything I knew that I did that I have now today. I mean, I didn't know all my rights. I didn't have all that stuff." Smith Dep. at 96. And, in his affidavit, Plaintiff does not say anything about the EEO time limits and whether he was aware of them. See generally

Smith Aff. Further, Ms. Bookhart (through the Bookhart Decl.) makes clear that Plaintiff was advised in both 2011 and 2013 that if EEO counseling or contact was desired, it had to be requested within "45 days of an event or decision thought to be discriminatory." Bookhart Decl. at 1.

There is no genuine dispute on the point whether Plaintiff knew about the forty-five day deadline. It is undisputed that Plaintiff contacted an EEO counselor on November 25, 2013 and filed the EEO Complaint the same date. See Smith Dep. at Ex. 13. Thus, to the extent he challenges his November 19, 2013 dismissal from the internship as discriminatory and/or retaliatory, he timely began the EEO process. On this record, it would appear that any other alleged "discrete" acts occurring more than forty-five days prior to November 25, 2013, were not timely brought to the attention of the EEO counselor. But Defendant does not point to anywhere in the record where a timeliness determination was made by the EEO counselor. The undersigned notes that during the EEO process, Plaintiff specifically brought to the attention of the counselor through an affidavit that he "asked [Ms. Bradshaw] for a modified work schedule due to fatigue and other service connected disabilities," and he explained that Ms. Bradshaw began to retaliate against him in response, "suddenly threatening [his] termination." Smith Dep. at Ex. 14 p. 1. So, the EEO counselor at least generally had before her Plaintiff's allegations of requests for accommodations and retaliation; the agency may well have had the "information it need[ed] to investigate and resolve the dispute between the employee and the employer." Brown, 440 F.3d at 1263. Given the foregoing, the undersigned assumes without deciding that Plaintiff has properly exhausted his administrative remedies as to all claims.

**B. Discrimination in Violation of the Act (Counts I and IV)**

The Act "prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability." Shiver, 549 F.3d at 1344 (quotation and citation omitted); see 29 U.S.C. §§ 791, 794, 794a.[20] Plaintiff's claims for discrimination are predicated on Defendant "not making reasonable accommodations for [Plaintiff] with the knowledge of his disabilities"; "treating [Plaintiff] over critically compared to other employees to the point of harassment in retaliation of, and based on, his request for accommodations"; "denying [Plaintiff] opportunities for promotion in retaliation of, and based on, his request for accommodations"; and "[t]erminating [Plaintiff] in retaliation of, and based on, his request for accommodations." Am. Compl. at 7 ¶ 46, 10 ¶ 64.[21]

"An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer." Boyle v. City of Pell City, 866 F.3d 1280, 1289 (11th Cir. 2017) (citation omitted). "The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job in question." Id. (citation omitted). An employer also discriminates against an otherwise qualified person with a disability when it terminates the person "because of" the disability. Id. (citation omitted). Accordingly, the

---

[20]     "The remedies, procedures, and rights of Title VII [of the Civil Rights Act of 1964] are available to plaintiffs filing complaints under the [Act]." Shiver, 549 F.3d at 1344 (citing 29 U.S.C. § 794a(a)(1)). And, "[t]he standard for determining liability under the [Act] is the same as that under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ('ADA'); thus, cases involving the ADA are precedent for those involving the [Act]." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted).

[21]     The discrimination claim brought under Section 504 (count IV) leaves out Defendant's alleged "treating [Plaintiff] over critically compared to other employees to the point of harassment in retaliation of, and based on, his request for accommodations." That allegation is only in the Section 501 claim for discrimination (count I). Compare Am. Compl. at 7 ¶ 46, with id. at 10 ¶ 64.

undersigned addresses the discrimination claims as they relate to the alleged failure to reasonably accommodate and the ultimate election not to convert Plaintiff's position (akin to termination).[22]

### i. Prima Facie Case of Discrimination

"To establish a prima facie case of discrimination [for termination] under the . . . Act, a plaintiff must show that (1) he has a disability, (2) he is otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as a result of his disability." Boyle, 866 F.3d at 1288 (citation omitted). "To establish a prima facie claim for failure to accommodate, [a plaintiff] must show that (1) []he is disabled; (2) []he was a qualified individual at the relevant time, meaning []he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) []he was discriminated against by way of the defendant's failure to provide a reasonable accommodation." Solloway v. Clayton, 738 F. App'x 985, 987 (11th Cir. 2018) (emphasis and quotation omitted) (citing Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001)). In the Motion, Defendant challenges all three elements with respect to both the termination and the failure to accommodate. See Motion at 9-16. The undersigned only addresses the first element for each type of alleged discrimination and finds Plaintiff has not met it.

To be considered disabled under the Act, an individual must show he "has a physical or mental impairment which substantially limits one or more major life activities," he "has a record of such an impairment," or he "is regarded as having such an impairment." 45 C.F.R. § 84.3(j)(1); see Boyle, 866 F.3d at 1288 (citations omitted). "Major life

---

[22] The other two bases Plaintiff alleges in the Amended Complaint for "discrimination" are more appropriately addressed in discussing the retaliation and hostile work environment claims.

activities" include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii); see Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004). In addition to these listed functions, "[s]everal courts . . . have found that sleeping constitutes a major life activity." Rossbach, 371 F.3d at 1357 (citation omitted). As well, the ADA now recognizes sleeping and concentrating (among other things) as major life activities. See 42 U.S.C. § 12102(2)(A).

"Has a record of such an impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 45 C.F.R. § 84.3(j)(2)(iii). Being "regarded as having an impairment means (A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by recipient[23] as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (C) has none of the [impairments specifically defined in the Regulations] but is treated by a recipient as having such an impairment." Id. § 84.3(j)(2)(iv).

It was initially unclear to the Court exactly what Plaintiff claimed was his disabling condition (or conditions) under the Act. Plaintiff focused during his deposition on his sleep apnea and other conditions that affect his energy levels and ability to concentrate. Then, in the Response, Plaintiff relied on various "musculoskeletal disabilities" that "precluded

---

23 "Recipient means any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance." 45 C.F.R. § 84.3(f).

prolonged physical maneuvering" and neck aggravation and headaches caused by "constant computer work." Response at 8 (citing id. at Ex. A (Doc. No. 62-1)). When asked to clarify during oral argument, Plaintiff's counsel contended that "the sleep apnea is the heart of the issue here," Tr. at 66, but he relied to a lesser degree on the musculoskeletal impairments, see id. at 64-65. There is hardly any evidence in the file supporting a contention that Plaintiff's musculoskeletal impairments substantially limit Plaintiff's major life activities, that there is a record of such, or that they are regarded as such. [24] And, the problems during the internship and accommodations that Plaintiff requested do not have anything to do with the musculoskeletal impairments. Accordingly, the Court focuses on the alleged impairments that cause tiredness, lack of concentration, and low energy: that is, sleep apnea, the headaches, the Vitamin D deficiency, the thyroid deficiency, and low testosterone. See Smith Dep. at 29-30, 33.

---

[24] The only real evidence on the musculoskeletal impairments are the VA's general disability percentage ratings, undated portions of an opinion authored by a Veterans Law Judge, see generally Response at Ex. A, very brief testimony of Plaintiff concerning them, see Smith Dep. at 42-45 (Plaintiff testifying about unspecified limitations walking, climbing, bending, stooping, crawling, and prolonged standing or walking, testifying that he can "[p]ossibly walk two hours per day," and testifying he is not aware of any currently-imposed doctor limitations regarding walking, standing, lifting, or sitting) and Plaintiff's affidavit referring to them, see Smith Aff. at 2 (stating, "The [unidentified vocational rehabilitation] counselor noted that my musculoskeletal disabilities precluded prolonged physical maneuvering, and it was noted that constant computer work would aggravate his [sic] neck and cause headaches").

Defendant's counsel and the Court pointed out to Plaintiff's counsel during oral argument that the Veterans Law Judge's decision (Response at Ex. A) is undated and only excerpts of it were submitted, so it likely has authenticity problems. Tr. at 77, 83, 84; see Fed. R. Civ. P. 56(c)(2) (stating that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"). According to Defendant's counsel, the decision "has to do with [Plaintiff's] entitlement to veterans benefits" and cites dates from "2016, 2014" meaning it was rendered after the events at issue in this case. Tr. at 84. Based on all of these problems, the Court declines to consider the submitted portions of this undated decision for purposes of deciding the instant Motion. See, e.g., Fed. R. Civ. P. 56(c)(2); Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees, 507 F.3d 1306, 1312 (11th Cir. 2007) (stating that "the requirement that a person must presently be substantially limited necessarily means the person must be substantially limited in a major life activity at the time of the discrimination, and not several years later) (emphasis added).

Plaintiff has established that he has impairments that may cause tiredness, lack of concentration, or low energy. He has failed to establish, however, that these impairments have substantially limited any of his major life activities. To start, Plaintiff relies almost solely on the undated excerpts of an opinion authored by a Veterans Law Judge to argue that questions of material fact exist that preclude summary judgment on this point. See Response at 8 (citing id. at Ex. A). As explained supra at note 24, however, the Court declines to consider that opinion because of the authenticity problems with it. In the Sur-Reply, Plaintiff also relies broadly on his "combination of disabilities" to satisfy this element. Sur-Reply at 2 (emphasis omitted). But, as explained above, there is insufficient evidence with respect to the musculoskeletal impairments. And, this broad argument does not assist the Court in determining whether any of Plaintiff's impairments substantially limit his major life activities.

Even independently reviewing the file for evidence of a substantial limitation of major life activities, the undersigned does not find the element to be satisfied. Although Plaintiff confirmed in his deposition that "ability to work" is the major life activity he claims is substantially limited, see Smith Dep. at 46, the undersigned has also considered sleeping and concentrating as possible major life activities that are substantially limited, see Rossbach, 371 F.3d at 1357 (citation omitted); 42 U.S.C. § 12102(2)(A) (ADA stating sleeping and concentrating can be major life activities). The record here does not contain any medical opinion, much less one stating that Plaintiff's impairments (to include the sleep apnea) substantially limit him in these areas.[25] See Garrett, 507 F.3d at 1315 (affirming

_____

[25] During oral argument, Plaintiff's counsel initially stated that he submitted a report from a "Dr. Aung" that "suggest[s] that he has a disability that affects his ability to sleep." Tr. at 74. When questioned by the Court about where to find such a report (the Court's recollection is that he had not submitted one as part of the summary judgment proceedings), counsel stated he did not see it in his opposition papers. Id.

the grant of summary judgment on discrimination and retaliation claims under the Act, and noting "the lack of any objective evidence of the extent of [the plaintiff's] limitations"); Croons v. N.Y. State Office of Mental Health, 18 F. Supp. 3d 193, 211 (N.D.N.Y. 2014) (quotation omitted) (finding that to survive summary judgment on the issue of whether a condition substantially limits a major life activity, a plaintiff must support a description of limitations with competent medical evidence); cf. Peklun v. Tierra Del Mar Condo. Ass'n, Inc., No. 15-CIV-80801-BLOOM/VALLE, 2015 WL 8029840, at *9 (S.D. Fla. Dec. 7, 2015) (unpublished) (record contained treating physicians' opinions about effects of the plaintiff's sleep apnea, including "excessive day-time drowsiness") (unpublished) (internal quotations omitted).

Nor do Plaintiff's own testimony or the VA disability ratings suffice to meet this element of a prima facie case. Plaintiff did testify, generally, that "[a]t that time . . . if [he] slept that night, [he] fe[lt] like [he] didn't get any sleep" and when he arrived at the office, "[he] felt like it was hard to focus or concentrate because [he] was tired, fatigued." Smith Dep. at 37. But, Plaintiff's testimony fails to establish the severity of his conditions sufficient to meet the "substantial limitation" requirement. See Garrett, 507 F.3d at 1315 (citation omitted) (stating, "To the extent that [the plaintiff] has relied on her subjective observations of her limitations, her statements are repeatedly couched in general and vague terms" and such testimony "is insufficient, particularly in the absence of evidence that a described affliction is worse than is suffered by many adults"). And, without more, the VA ratings do not address the severity requirement under the Act. See, e.g., Silman

---

at 76-77. The Court has since confirmed that this report is not part of the summary judgment record. Despite realizing during oral argument that it had not been submitted, Plaintiff's counsel did not move to supplement the record with it.

v. Utica College, No. 6:14-cv-0432 (LEK/TWD), 2016 WL 4275721, at *6 (N.D.N.Y. Aug. 12, 2016) (unpublished) (citation omitted) (finding that a plaintiff's "submission of an evaluation done by the VA" that contained a disability rating was "insufficient to establish a genuine issue of material fact" regarding disability status in a case brought under the Act); Wingfield v. South Univ. of Fla., Inc., No. 8:09-cv-1090-T-24TBM, 2010 WL 2465189, at *7 (M.D. Fla. June 15, 2010) (unpublished) (quotation and citation omitted) (granting summary judgment in a case brought in part under the ADA and stating that "the VA's disability rating apparently accounts for loss of earning capacity and involves a completely different inquiry than the one the Court must perform"). In short, summary judgment is appropriate due to the lack of evidence that Plaintiff's sleep apnea and other impairments were sufficiently severe such that they substantially limited any major life activity. See Mont-Ros v. City of West Miami, 111 F. Supp. 2d 1338, 1355 (S.D. Fla. 2000) (finding same).

Although Plaintiff does not make the argument in his papers, at oral argument, his counsel indicated that "if we were to assume for a moment that it's not a covered disability," then the actions were taken "based upon [Plaintiff's] perceived disability." Tr. at 63. Counsel also pointed out that Ms. Bradshaw had to have known, and admitted she knew, that Plaintiff was at least thirty-percent disabled under the VA rating system to qualify for the internship in the first place, id. at 82; see Bradshaw Dep. at 14, a contention with which Defendant does not quarrel, see Tr. at 86. The Court construes these comments as attempting to meet the "regarded as" disabled requirement. See 45 C.F.R. § 84.3(j)(2)(iv).

"[F]or a plaintiff to prevail on a perception theory of disability discrimination, he must be able to show that, as with a real impairment, the perceived impairment is substantially

limiting and significant." Sutton v. Lader, 185 F.3d 1203, 1208 (11th Cir. 1999) (quotation and citation omitted). Here, there is no evidence that Ms. Bradshaw knew Plaintiff's specific alleged disabilities (via the VA rating system or any other source). See, e.g., Bradshaw Dep. at 54 (Ms. Bradshaw testifying, "I'm not aware of what his specific service-connected disabilities are"); Smith Dep. at 76 (Plaintiff testifying he generally "told [Ms. Bradshaw] about the medical issues [he] was going through and all she did was keep pushing [him] to get the reports in, which wasn't going to help [him] get there"); id. at Ex. 3 p. 3 (Plaintiff testifying during his EEO proceedings that "[i]n the beginning [management] didn't know everything about [his disability], but as I was having some struggles at work, they did, I informed them what was going on in October of—October of 2012, I let them know what was going—oh, I let Tami [Bradshaw] know"). At best and in the light most favorable to Plaintiff, the record reflects Plaintiff generally told Ms. Bradshaw he was having unspecified "medical issues," made her aware he had unspecified "disabilities," and told her he was "fatigued" due at least in part to staying up late to complete school work. But, "[t]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled."[26] Sutton, 185

---

[26] Although Plaintiff does not rely on it for purposes of making an argument about being regarded as having an impairment, the Court notes that he did allege in the Smith Aff., submitted as part of the summary judgment record, that "[o]n October 17, 2012, I reported to [INSERT] that due to a service connected disability of sleep apnea, that I was unable to get sufficient sleep which adversely affected my performance at work." Smith Aff. at 3 ([INSERT] in original). This sentence in the Smith Aff. obviously does not name the person to whom Plaintiff allegedly reported this specific information, and none of the other evidence of record contains these specifics. Accordingly, and because Plaintiff does not rely on it, the undersigned disregards this sentence. See, e.g., Fed. R. Civ. P. 56(c)(3) (noting that "[t]he court need consider only the cited materials, but it may consider other materials in the record"); Ellis, 432 F.3d at 1326 (citation omitted) (stating that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion").

In the light most favorable to Plaintiff, the evidence shows that his mentor and personal vocational rehabilitation counselor, Ms. Murphy, knew that Plaintiff had musculoskeletal impairments. See Smith Aff. at 2. But, there is insufficient evidence for the Court to evaluate the musculoskeletal impairments in the first place, see supra at 29, and there is insufficient evidence that Ms. Murphy or anyone else regarded any perceived impairment (including musculoskeletal ones) as substantially limiting and significant. Further,

F.3d at 1209. Further, the record does not reflect any perception by Plaintiff's supervisor that the alleged impairments were "substantially limiting and significant." Id. (quotation and citation omitted). Accordingly, Plaintiff cannot show he was "regarded as having the impairment," either.

Plaintiff has not established he is disabled under the Act and therefore does not meet the first element of a prima facie case of discrimination.

### ii. Legitimate Reason for Termination / Pretext

Alternatively, the undersigned addresses the reasons articulated by Defendant for the termination (or election not to convert Plaintiff's position) and whether those reasons are merely pretextual. Because Plaintiff has not presented any evidence of direct discrimination, he must prove his claims for termination discrimination using the McDonnell Douglas burden-shifting framework.[27] See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, only if a plaintiff establishes a prima facie case for discrimination does the burden shift to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. See Connelly v. WellStar Health Sys., Inc., 758 F. App'x 825, 828 (11th Cir. 2019) (citing Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001)). If the defendant provides a legitimate reason, then the plaintiff must show that the proffered reason is merely pretextual. Id. (citing Wascura, 257 F.3d at 1242-43).

---

although Ms. Murphy served as Plaintiff's mentor during the relevant time, there is no evidence that she communicated anything about Plaintiff's alleged impairments to Plaintiff's supervisor.

[27] Nowhere does Plaintiff argue that a "convincing mosaic of circumstantial evidence" would allow a jury to infer intentional discrimination. See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Both he and Defendant present their analyses of the discrimination claims under the McDonnell Douglas burden-shifting framework. The Court does not find any "convincing mosaic of circumstantial evidence" to preclude granting summary judgment.

Pretext means that the reason provided by the employer was "not the real reason[] for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted). "A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 865 (11th Cir. 2012) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)) (internal alteration omitted). "A plaintiff will withstand summary judgment by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (citing Combs, 106 F.3d at 1538); see also Springer v. Convergys Customer Mgmt. Grp., Inc., 509 F.3d 1344, 1348 (11th Cir. 2007) (per curiam) (citation omitted).

Here, Defendant proffers that Plaintiff was not converted to the permanent position of VR&E counselor because "Plaintiff failed to meet an expected level of performance and, thus, [Ms. Bradshaw] did not provide a recommendation in favor of Plaintiff's conversion to [Ms.] Witty." Motion at 22. Accordingly, states Defendant, Plaintiff "fail[ed] to meet the minimum requirements for such conversion." Id.

Plaintiff points to his fully successful performance evaluations to argue that Defendant's reasons for not converting him to a permanent position are implausible or inconsistent. Response at 13. Notably, however, the first two formal performance evaluations indicated that Plaintiff was still learning the position and that certain performance standards were being mitigated as a result. And, Ms. Bradshaw explained that, had she not marked Plaintiff fully successful on his VA performance evaluations, he

would have been removed and would not have been able to complete his internship. But perhaps most importantly, in light of the evidence in the file regarding deficiencies with Plaintiff's work, the performance evaluations do not sufficiently undermine the stated reason for Ms. Bradshaw's election not to recommend conversion to Ms. Witty. As explained in detail in the Facts Section, there are numerous undisputed documented instances in which Plaintiff's work suffered in both quality and timeliness. There are also four internship evaluations for Thomas University—completed at various times during Plaintiff's internship—documenting continuous struggles with time management, writing, correcting mistakes, and dealing with stress.[28] Ms. Bradshaw even took the generous step of allowing Plaintiff additional time to prove himself upon his request, but Plaintiff's work did not sufficiently improve. In short, Plaintiff has not demonstrated that the reasons for the election not to convert his position were so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable factfinder could find them unworthy of credence. See Gilliard, 500 F. App'x at 865 (citing Combs, 106 F.3d at 1538).

### iii. Accommodation Requests

Also as an alternative to Plaintiff's failure to prove a disability as part of a prima facie case of discrimination through lack of reasonable accommodations, the undersigned addresses the actual accommodation requests. "[A]n employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination . . . so long as that

---

[28] These evaluations, discussed in detail in the Facts Section, are collectively attached as Exhibit 4 to Plaintiff's deposition. As noted in footnote 8, Plaintiff has not raised any authenticity issues with them for purposes of the summary judgment proceedings even though he stated in his deposition that he did not receive the evaluations until discovery in this case. See Smith Dep. at 53-54. Given the lack of objection, the Court has considered them. But, even if the Court were to ignore these evaluations, it would still conclude that Plaintiff has not demonstrated a reasonable factfinder would find the stated reasons not to convert him unworthy of credence.

individual is 'otherwise qualified,' and unless the employer can show undue hardship." Holly v. Clairson Industs., LLC, 492 F.3d 1247, 1262 (11th Cir. 2007). "Unlike in the discriminatory-termination context, though, . . . the employer need not show that it had legitimate non-discriminatory reasons for its actions, and the employer need not establish that the employer's stated reasons were pretextual." Connelly, 758 F. App'x at 831 (citing Holly, 492 F.3d at 1262).

Regarding Plaintiff's accommodation requests, in the light most favorable to Plaintiff, he asked Ms. Bradshaw for his own office and that was denied because he was an intern (and interns did not have offices). Also, he asked to come in late and make up the time later or on Saturdays, but those requests were denied because overtime could not be approved for budgetary reasons, and because it was rare for interns to work on Saturdays unless the type of work they were doing allowed for it. Plaintiff admits he was provided the accommodation of anti-glare screens when he requested it through HR, and he admits he did not request any other accommodations from HR (other than larger computer font which he received directions on how to achieve).[29]

According to Defendant, "Plaintiff neither alleged nor demonstrated . . . that he specifically identified to Ms. Bradshaw the condition or impairment for which he purportedly needed an accommodation," Reply at 5, and that alone precludes his claim for failure to

---

[29] Defendant contends that "there is no genuine issue of fact that Plaintiff failed to make a proper request for the accommodation[s of having his own office and coming in on Saturdays] through the Defendant's established process for requesting an accommodation, [that] Defendant had no duty to accommodate th[ese] request[s] and [that] Plaintiff has no claim for failure to accommodate th[ese] request[s]." Reply at 5-6. According to Plaintiff's deposition testimony, however, he did not request these accommodations through HR because they had already been denied by Ms. Bradshaw. Viewed in the light most favorable to Plaintiff, the record at least demonstrates an issue as to whether he properly requested these accommodations, and the undersigned assumes for purposes of this Order that he did.

accommodate. Plaintiff asserts merely that he made specific accommodation requests and therefore Defendant had a duty to provide them. Sur-Reply at 3.

For largely the same reasons Plaintiff has not shown he was "regarded as" disabled by Ms. Bradshaw, see supra at Section IV.B.i., he cannot show he was entitled to the accommodations he requested from her. The record demonstrates that Ms. Bradshaw was not aware of the specifics of Plaintiff's alleged disabilities. Even though Plaintiff, viewed in the light most favorable to him, requested specific accommodations of Ms. Bradshaw, she was under no duty to provide them if she did not even know the basis of the requested accommodations. Plaintiff's accommodations claims fail.

## C. Retaliation in Violation of the Act (Counts II and V)

Plaintiff's retaliation claims are predicated on his requests for accommodations and Defendant allegedly "treating [him] over critically compared to other employees to the point of harassment in retaliation of, and based on, his request for accommodations," "denying [Plaintiff] opportunities for promotion in retaliation of, and based on, his request for accommodations," and "terminating [Plaintiff] in retaliation of, and based on, his request for accommodations." Am. Compl. at 8 ¶ 52, 11 ¶ 70.

To establish a prima facie case of retaliation under the Act, a plaintiff must show "(1) [he] engaged in statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) there was a causal link between the adverse action and [his] protected expression." Solloway v. Clayton, 738 F. App'x 985, 988 (11th Cir. 2018) (citing Stewart, 117 F.3d at 1287). If the "plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action." Id. (emphasis omitted) (citing Stewart, 117 F.3d at 1287). "If the

employer meets its burden, 'the plaintiff must then demonstrate that it will be able to establish at trial that the employer's preferred non-discriminatory reasons are a pretextual ruse designed to mask retaliation.'" Id. (quoting Stewart, 117 F.3d at 1287).

With respect to the first requirement to establish a prima facie case—engaging in statutorily protected expression—it is sufficient to show that the plaintiff "ha[s] a good faith, objectively reasonable belief that he was entitled to those accommodations." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1329 (11th Cir. 1998). For purposes of this Order, the undersigned assumes Plaintiff had a good faith, objectively reasonable belief that he was entitled to the requested accommodations. See id. Plaintiff, in arguing against summary judgment, contends the adverse employment action he suffered was the "decision to allow his temporary appointment to expire" and to elect "not to convert him to a permanent position." Response at 11. The undersigned assumes this is an adverse employment action. But, as explained below, he has not shown a causal link between the adverse action and his protected expression. See Solloway, 738 F. App'x at 988 (citing Stewart, 117 F.3d at 1287). Nor has he demonstrated that he would be able to establish at a trial that Defendant's preferred non-discriminatory reasons for taking its action were a pretextual ruse designed to mask retaliation. See id. (citing Stewart, 117 F.3d at 1287).

To start, Plaintiff did not request an accommodation until after he had been counseled by Ms. Bradshaw on at least two occasions—once by email on September 21, 2012 and once in person on October 12, 2012—regarding his deficient performance. It was during the October 12, 2012 meeting that Ms. Bradshaw first explained that "things were not looking good" for Plaintiff's conversion to a permanent position. Notably, it was not until after the meeting that Plaintiff requested accommodations. Further, because Ms.

Witty made the ultimate decision not to convert Plaintiff's position, and there is no evidence that she knew about his requested accommodations or any history of EEO protected activity, Plaintiff has not established causation as it relates to the expiration of his internship and election not to convert his position.  See Stone v. Geico Gen. Ins. Co., 279 F. App'x 821, 824 (11th Cir. 2008) (citation omitted) (noting the Eleventh Circuit "rule that the protected activity must be known to the decision-maker who takes the adverse action"); see also Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799-800 (11th Cir. 2000) (explaining that temporal proximity is insufficient to establish causation when there is unrebutted evidence that the decision maker did not know about the incident).

As for Defendant's proferred reasons for terminating Plaintiff and electing not to convert his position, for the same reasons discussed supra at Section IV.B.ii., Plaintiff has not demonstrated that he would be able to establish at a trial that Defendant's proferred non-discriminatory reasons for taking its action were a pretextual ruse designed to mask retaliation.

For all of the foregoing reasons, Plaintiff's retaliation claims fail.

### D.  Interference, Coercion, or Intimidation (Counts III and VI)

These claims are predicated on Defendant "treating [Plaintiff] over critically compared to other employees, to the point of harassment and intimidation, based on his request for accommodations" and "threatening termination of [Plaintiff's] employment with the VA based on the exercise of his rights to request an accommodation."  Am. Compl. at 9 ¶ 58, 12 ¶ 76.  As previously noted, Plaintiff's counsel at argument agreed that these claims are akin to a claim of hostile work environment.  Tr. at 70.  For the reasons already articulated, Plaintiff cannot establish a claim hostile work environment (or, to the extent he

alleges it, of retaliatory harassment).   Plaintiff offers no evidence of harassment or hostile work environment that would support this claim beyond the evidence already considered (and rejected) as supporting his retaliation claims.   Cf. Gowski v. Peake, 682 F.3d 1299, 1312 (11th Cir. 2012) (recognizing a cause of action for retaliatory hostile work environment where a severe and pervasive accumulation of actions would not have occurred but-for a retaliatory reason).

## V.   Conclusion

For all of the foregoing reasons, the Motion is due to be granted.   Accordingly, it is

**ORDERED:**

Defendant's Motion and Memorandum for Summary Judgment (Doc. No. 56) is **GRANTED**.   The Clerk shall enter judgment on all counts in favor of Defendant Robert Wilkie, the Secretary of the VA, and against Plaintiff, Timothy S. Smith.   The Clerk shall thereafter close the file.

**DONE AND ORDERED** in Jacksonville, Florida on September 27, 2019.


*James R. Klindt*

**JAMES R. KLINDT**
United States Magistrate Judge


kaw
Copies:
Counsel of Record